IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| RAHEEM HARRITY, | Civil Action |
| Petitioner, | No. 18-13445 (NLH) |
| v. | |
| MR. STEVEN JOHNSON, et al., | OPINION |
| Respondents. | |

APPEARANCES:

Raheem Harrity
460023-C
New Jersey State Prison
PO Box 861
Trenton, NJ 08625

    *Petitioner pro se*

Grace C. MacAulay, Camden County Prosecutor
Linda A. Shashoua, Assistant Prosecutor
Camden County Prosecutor's Office
25 North Fifth Street
Camden, NJ 08102

    *Attorney for Respondents*

HILLMAN, District Judge

I.   INTRODUCTION

Raheem Harrity, a state prisoner confined at New Jersey
State Prison, is proceeding on an amended petition for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254.  ECF No. 21.
Respondents oppose the petition.  ECF No. 25.  For the reasons

stated herein, the petition shall be denied.  No certificate of appealability shall issue.

II.  BACKGROUND

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, 28 U.S.C. § 2254(e)(1), reproduces the recitation of the facts as set forth by the New Jersey Superior Court, Appellate Division ("Appellate Division") in its opinion denying Petitioner's direct appeal:

> On May 27, 2004, at approximately 8:00 p.m., on Sixth Street between Erie and York Streets in Camden, thirty-two year-old Alejandro Soto and eighteen-year-old Alejandro Castro were shot and killed.  Soto was driving his fiancée's 1987 Jeep Cherokee wagon and Castro was riding in the front passenger seat when Soto pulled over to the curb to talk to his nieces, thirteen-year-old Angelimar Vargas and her twelve-year-old sister, Marangelie.  As the girls talked to their uncle through the front and rear passenger windows, a black, 1995 Monte Carlo with tinted windows approached from the opposite direction and stopped alongside of the Jeep so that the drivers' windows were next to each other.  The driver of the Monte Carlo pointed a silver pistol and fired repeatedly into the jeep.  Four bullets struck Soto, one above his left eye, one in his nose, one in his left shoulder, and the last in his right forearm.  Bullets struck Castro in his forehead and right, lower thigh. Both men died from the bullet wounds.
>
> Although Soto's nieces saw a driver and passenger in the Monte Carlo, neither could describe the passenger. Angelimar described the driver as Spanish, with lighter skin tone than her own, braided hair with his "baby hair ... laid down," and a goatee.  The driver also had a tattoo on the "right-hand side ... of [his] arm." Angelimar testified on cross-examination that she did not remember the exact color of the shooter's car and she did not know what the shooter looked like.

Marangelie thought the car looked like a black Lexus with tinted rear windows. She could not describe either the driver or the passenger.

When the shootings occurred, Camden City Police Officers Louis Acetti and David Barrientos were parked in a marked police "paddy wagon" at the corner of Sixth and Erie. Hearing shots, Officer Barrientos looked toward Sixth and York Streets and saw a black vehicle with someone's hand protruding from one of the car's windows.  The car accelerated, came toward the police wagon at a high rate of speed, and turned on Erie directly in front of the officers, who gave chase.  Barrientos "called a pursuit out."  When Officer Barrientos saw his lieutenant, Frank Cook, in another police vehicle that was pursuing the fleeing car, Barrientos radioed that he was returning to the scene and that Lieutenant Cook should continue the pursuit.  Officer Barrientos could not determine how many people were in the fleeing vehicle, and could not describe anyone.

As Lieutenant Cook pursued the fleeing car, he broadcast that the driver had a "quarter-length afro, a quarter of the hair a little high cut," with dark or medium skin, but he was uncertain about the skin color because the car's windows were tinted.  Lieutenant Cook also said the driver wore "a light or cream-colored shirt."  At trial, however, he testified that he could see only the passenger and that the description he provided was a description of the passenger, not the driver.  The description Lieutenant Cook gave while pursuing the fleeing car was consistent with that given by another officer, Bianca Rivera, who described the driver as a male with a medium complexion wearing a white shirt and a baseball cap.

Another Camden City Police Officer, Curtis Davis, spotted the car after receiving radio transmissions about the pursuit.  Davis joined the pursuit and followed the car for a short distance, lost sight of it for approximately fifteen seconds, then saw that it had been abandoned in the middle of Magnolia Street near an alleyway.  After looking into the car, Davis looked down the alleyway and saw a man wearing a red and white jersey running away.  The man removed the jersey and threw it into someone's yard.  He eluded the police.  The police

learned that the car, a Monte Carlo, was registered to Danyel Morton.

No physical evidence recovered from the car or the crime scene directly linked defendant to the crime. The discarded jersey contained no blood. DNA tests of swabs from the "underarms area and the inside of the neck area" of the jersey did not establish the DNA as defendant's, but defendant could not be excluded as a partial source of a stain on the jersey. A ballistics expert testified that the bullets that killed Soto and Castro were likely fired from one firearm, which could have been a nine millimeter Luger caliber high-point semi-automatic pistol.

Investigators learned that earlier in the day, at 2:55 p.m., Collingswood Police Officer Michael Pope had stopped a man driving the Monte Carlo that was later used in the shootings. According to Officer Pope, the driver was a light-skinned black male, approximately five feet, five inches tall, wearing earrings in both ears and a football jersey with the name D. Thomas and the number fifty-eight. The driver also had a small goatee. Unlicensed, the driver identified himself as Malik Cox. Officer Pope contacted Morton, satisfied himself that Malik Cox was permitted to drive Morton's car, then issued two traffic summonses. At trial, Officer Pope identified defendant as the person to whom he issued the summonses.

Morton testified at trial that defendant was the father of her child. The 1995 Black Monte Carlo used during the shootings was registered to her. Defendant had purchased the car and paid for insurance, but registered it in Morton's name because he had no driver's license. On the day Officer Pope stopped defendant in Collingswood, Morton told the officer that defendant was Malik Cox because that was Morton's standard story if defendant were stopped while driving the car. Morton also confirmed that defendant had a red sports jersey in May 2004.

After defendant was stopped by Officer Pope in Collingswood, he went to the Bridgestone Firestone in Mount Ephraim where a worker refunded some of the money defendant had paid for repairs to the car. According to

the Firestone worker, defendant was wearing jeans and a "sports throw back jersey[ ]."

The police initially suspected that defendant's brother, Lamar Harrity, might have been involved in the shootings. Two days after Soto and Castro were shot, Camden County Prosecutor's Senior Investigator Kevin Kellejan questioned Lamar Harrity's friend, Stephon Cushion, who said Lamar was with him when Soto and Castro were shot.

Cushion testified at trial that Lamar Harrity was a close friend, like a cousin. On the night of the shootings, Cushion let Lamar Harrity use the Intrepid that Cushion regularly drove. Cushion did not need the car because he intended to watch one of his daughters perform in a school play. During the play, one of Cushion's other daughters started to cry, so he called Lamar Harrity who returned to the school in the Intrepid. According to Cushion, Lamar Harrity returned to the school around seven or eight o'clock and they hung out until the play ended, around nine o'clock. Cushion then gave Lamar Harrity twenty dollars to catch a cab home.

Two months after the shootings, on August 21, 2004, defendant's unindicted co-conspirator and accomplice, Anthony Harris, confessed to being the passenger in the car when defendant shot Soto and Castro. Harris, who had a lengthy criminal history, was arrested on August 21 for selling drugs. He told the police he had information about the Soto and Castro homicides. According to his trial testimony, several days before the shootings he met Soto, who claimed to have several AK-47s for sale. Harris telephoned defendant, who later appeared and drove off with Soto. When defendant returned, he was bleeding from the face. Soto had robbed him.

On the night of the homicides, Harris spotted Soto in a black car and was able to speak with him. Although Harris did not testify clearly about where defendant was when Harris spoke to Soto, after the conversation Harris told defendant that Soto was in the car. Defendant had an instant reaction and the two drove to the Washington Apartments where defendant got a nine millimeter Luger pistol. Harris and defendant drove to the "Dope Streets" in North Camden to look for Soto. When they turned onto

Sixth Street, Harris noticed the Jeep that Soto was driving.  Even though a police paddy wagon was parked ten cars in back of the Jeep, they pulled along the Jeep and defendant started shooting.

Shortly after the shooting, Harris grabbed the gun and jumped from the car.  He watched as the paddy wagon drove by, and then left the area.  Two days later, he met defendant at a motel.  Defendant and a woman named Ashley were going to say that on the night of the homicide, they fought and defendant got out of the car.  That was supposed to be their alibi.  Defendant also told Harris that if something were to go wrong, defendant would report the car stolen.

Harris denied that defendant's brother, Lamar, had any involvement with the shooting.  Although Harris told police that he was wearing a green Eagles jersey and defendant was wearing a red D. Smith jersey when defendant shot Soto and Castro, at trial he claimed defendant left his jersey in the back seat of the car.

State v. Harrity, No. A-3060-10T2, 2013 WL 4503337 ("Harrity I"), at *1-4 (N.J. Super. Ct. App. Div. Aug. 26, 2013) (alterations and omissions in original).

"On September 26, 2007, a Camden County Grand Jury charged defendant with two counts of first-degree murder, N.J.S.A. 2C:11-3a(1) and (2) (counts one and two); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3a(1) and (2) (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); and third-degree unlawful possession of a weapon, N.J.S.A. 39:5(b) (count five)."  Id. at *5.  "The State notified defendant that Anthony Harris was the unnamed co-conspirator referenced in the indictment."  Id.

6

Harris entered into a cooperation agreement with the State. "In exchange for Harris cooperating with authorities and agreeing to testify truthfully against defendant, the State agreed to permit him to plead guilty to two counts of aggravated manslaughter, for which he received a fifteen-year aggregate sentence with an eight-five percent period of parole ineligibility under the No Early Release Act, (NERA) N.J.S.A. 2C:43-7.2." Id. at *4.  "Harris also received a custodial term for drug charges, but that term was imposed concurrently to his sentence on the manslaughter charges." Id.

The jury acquitted Petitioner of the first-degree murder charges but found him guilty of the lesser included offense of first-degree aggravated manslaughter, N.J.S.A. § 2C:11-4(a)(1). ECF No. 25-5.  Petitioner was convicted of all other charges. Id.  On July 30, 2010, the trial court "granted the State's motion for an extended prison term, merged counts three and four, and sentenced defendant to a thirty-year custodial term on count two subject to NERA; a consecutive term of life in prison on count one; and to a concurrent custodial term of five years with two and one-half years of parole eligibility on count five." Harrity I, 2013 WL 4503337, at *5.  The court later amended the judgment of conviction to reflect Petitioner's gap time credits.  ECF No. 25-6.

Petitioner appealed to the Appellate Division.  Harrity I, No. A-3060-10T2, 2013 WL 4503337.  The Appellate Division affirmed the convictions and sentence on August 26, 2013.  Id. The New Jersey Supreme Court denied certification on March 20, 2014.  State v. Harrity, 88 A.3d 191 (N.J. 2014) (Table).

Petitioner filed a post-conviction relief ("PCR") petition on June 19, 2014.  ECF No. 25-12.  The PCR court conducted a series of evidentiary hearings on Petitioner's ineffective assistance of counsel claims.  See 15T-17T.[1]  On January 8, 2016,

---

[1] 1T = Transcript of Motion Hearing dated April 23, 2010; ECF No. 25-34.

2T = Trial Transcript dated June 1, 2010; ECF No. 25-35.

3T = Trial Transcript dated June 2, 2010; ECF No. 25-36.

4T = Trial Transcript dated June 3, 2010; ECF No. 25-37.

5T = Trial Transcript dated June 7, 2010; ECF No. 25-38.

6T = Trial Transcript dated June 8, 2010; ECF No. 25-39.

7T = Trial Transcript dated June 9, 2010; ECF No. 25-40.

8T = Trial Transcript dated June 15, 2010; ECF No. 25-41.

9T = Trial Transcript dated June 16, 2010; ECF No. 25-42.

10T = Trial Transcript dated June 17, 2010; ECF No. 25-43.

11T = Trial Transcript dated June 21, 2010; ECF No. 25-44.

12T = Trial Transcript dated June 22, 2010; ECF No. 25-45.

13T = Trial Transcript dated June 23, 2010; ECF No. 25-46.

14T = Sentencing Transcript dated July 30, 2010; ECF No. 25-47.

the PCR court denied the PCR petition.  18T; ECF No. 25-20.
Petitioner appealed, and the Appellate Division affirmed the PCR
court.  State v. Harrity, No. A-2385-15T3, 2017 WL 4681943, at
*1 ("Harrity II") (N.J. Super. Ct. App. Div. Oct. 19, 2017).
Petitioner did not seek certification from the New Jersey
Supreme Court.  "Thereafter, over the course of 2018-2019,
Petitioner filed a series of four pro se PCR petitions, each of
which the trial court denied as asserting claims which were
previously denied."  ECF No. 25 at 7.

      Petitioner filed his original § 2254 petition on August 31,
2018.  ECF No. 1.  He also filed a motion to stay the
proceedings to allow him to exhaust his claims in state court.
ECF Nos. 2-3, 6.  Respondents did not object to the stay.  ECF
No. 13.  The Court granted the motion to stay on January 31,
2019.  ECF No. 15.  The order granting the stay provided that
"Petitioner shall return to this Court by filing a request to

---

15T = PCR Hearing Transcript dated May 29, 2015; ECF No. 25-48.

16T = PCR Hearing Transcript dated September 11, 2015; ECF No.
25-49.

17T = PCR Hearing Transcript dated November 12, 2015; ECF No.
25-50.

18T = PCR Hearing Transcript dated January 8, 2016; ECF No. 25-
51.

reopen this action within 30 days after exhaustion of his state law claims." <u>Id.</u>

One month after the stay was granted, Petitioner filed a request to reopen this matter and a motion to amend and resubmit his original § 2254 petition as well as a supplemental memorandum of law. <u>See</u> ECF Nos. 16 (motion), 16-1 (supplemental memorandum of law). Respondents opposed the request because it did not appear that Petitioner had exhausted his unexhausted claims. ECF No. 17. Respondent argued that in the alternative, the Court should dismiss all the unexhausted claims. <u>Id.</u> Petitioner later filed a "motion request to withdraw separate supplemental memorandum of law." ECF No. 18.

The Court denied the pending motions without prejudice and sought clarification from Petitioner. ECF No. 20. The Court instructed "Petitioner to file a statement with the Court explaining whether he has exhausted his unexhausted claims that were the subject of the stay, and, if they remain unexhausted, Petitioner is advised that he may either withdraw his unexhausted claims or that his Petition may [be] dismissed without prejudice as an impermissible mixed petition." <u>Id.</u> at 3 (citing <u>Rose v. Lundy</u>, 455 U.S. 509 (1982)).

Petitioner submitted a motion to reopen explaining the circumstances that led to his prior filing. ECF No. 22. Petitioner's third post-conviction relief petition was denied,

and "due to the Petitioner failing to effectively litigate the points contained in his third post-conviction relief and believing that further exhausting said grounds would have resulted in no successful relief" he decided to return to federal court.  Id. at 12-13.  In response to the Court's request for clarification, Petitioner asked the Court to "allow the Petitioner to delete any and all unexhausted issues and proceed with only his amended petition [ECF No. 21]."  Id. at 16 (emphasis in original). Petitioner further stated that only Ground One of the amended petition was exhausted.  Id. at 15.

The Court granted Petitioner's motion to reopen the proceedings.  ECF No. 23.  "However, in an abundance of caution and because Petitioner is a pro se litigant, the Court informs Petitioner that by deleting his unexhausted claims and continuing with only the exhausted Ground One of the amended petition, Petitioner will be barred from having a federal court review his other claims under 28 U.S.C. § 2254."  Id. at 3.  The Court gave Petitioner another opportunity to "request that his petition be dismissed without prejudice within 45 days of this Order.  If the Court does not receive any communication from Petitioner within that 45-day period, the Court will take that as Petitioner's assent to delete the unexhausted claims and proceed with only Ground One of the amended petition."  Id. Petitioner did not contact the Court within that timeframe, so

the Court ordered Respondents to answer Ground One of the amended petition.  ECF No. 24.

Respondents submitted their answer, ECF No. 25, and Petitioner submitted a traverse, ECF No. 28.

III. STANDARD OF REVIEW

Title 28 U.S.C. § 2254 permits a federal court to entertain a petition for writ of habeas corpus on behalf of a person in state custody, pursuant to the judgment of a state court, "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

With respect to any claim adjudicated on the merits by a state court, the writ shall not issue unless the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "[A] state-court decision is an unreasonable application of [Supreme Court] clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). "This means that a state court's ruling must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Shoop v. Hill, 139 S. Ct. 504, 506 (2019) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). The Court must presume that the state court's factual findings are correct unless Petitioner has rebutted the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

IV. ANALYSIS

The sole claim before the Court is Petitioner's claim that "the state's threat to charge a defense witness with perjury if he did not renunciate his statement recanting the statement he gave to police deprived the Defendant of his rights to due process and compulsory process." ECF No. 21 at 6. Petitioner exhausted this claim on direct appeal.

According to the Appellate Division:

During cross-examination, Harris admitted telling a defense investigator on September 29, 2008, that everything he told the police in August 2004 was false. Then on April 13, 2010, in preparation for trial, Harris spoke to the prosecuting attorney and one of her investigators, Kellejan, and told them everything he told the defense investigator was a lie. Harris told the prosecutor and Investigator Kellejan that in exchange for testifying truthfully at the trial, he "wanted reconsideration of [his] sentence." According to a statement provided by the State to defense counsel, when the prosecutor told Harris she was not in a position to reconsider his sentence he said: "If I can't get this ... upfront agreement done, I will mess this trial up."

Harris denied making that statement. He claimed to have told the prosecutor,

> I feel as though for everything that's falling on me ... and what I [have] been through, ... I feel as though this is too much time and if you don't put forth your best effort to see if this can't get rectified, I don't feel as though I should come to trial. For what? Because I'm already doing the time.

Defense counsel later confronted Harris with part of the written plea agreement, which stated:

> Anthony Harris agrees, as consideration for the State's agreement to permit Anthony Harris' sentencing to proceed as would normally be scheduled rather than have said sentencing held in abeyance until completion of any and all related criminal proceedings in which his cooperation and/or testimony are required, that the State may move before the [c]ourt to annul the plea agreement and the sentence within [thirty] days of the completion of any and all criminal matters in which his cooperation and/or testimony are required should the State determine that Anthony Harris has violated a term of this agreement.

14

Harrity I, 2013 WL 4503337, at *4 (alterations and omissions in original).[2]  Petitioner called Investigator Kellejan as a witness at trial.

> On April 13, 2010, shortly before the trial began, Investigator Kellejan interviewed Anthony Harris. When Harris said he would testify consistently with the statement he had given to police in exchange for reconsideration of his sentence, Investigator Kellejan "assured him that no promises, guarantees or agreements could be made."  When Harris responded by threatening to "mess up" the trial, Investigator Kellejan "inform[ed][him] that if he didn't testify truthfully according to the statement that he gave the prosecutor's office that he would be subject to perjury[.]"  The investigator also informed Harris "that if he did not testify according to that statement [,] ... his original plea agreement would be rescinded[.]"

Id. at *5 (alterations and omissions in original).  Petitioner argued "for the first time on appeal that the State's warning to Harris about perjury substantially interfered with Harris's decision to testify and thereby violated defendant's constitutional rights."  Id. at 7.

"The right of an accused to have compulsory process for obtaining witnesses in his favor stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the States."  Washington v. Texas, 388 U.S. 14, 18 (1967).  "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms

---

[2]Harris claimed on re-cross that the trial was the first time he had read this paragraph.  9T132:5-6.

the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." Id. at 19. "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." Id. See also Webb v. Texas, 409 U.S. 95, 98 (1972) (quoting Washington, 388 U.S. at 19).

"The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling by the trial judge." Gov't of Virgin Islands v. Mills, 956 F.2d 443, 445 (3d Cir. 1992). "A defendant establishes that his right to the compulsory process has been violated by demonstrating that '(1) he was deprived of the opportunity to present evidence in his favor; (2) the excluded testimony would have been material and favorable to his defense; and (3) the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purposes.'" Drury v. New Jersey, No. 3:13-CV-3135, 2020 WL 3264083, at *12 (D.N.J. June 16, 2020) (quoting United States v. Bianchi, 594 F. Supp. 2d 532, 545 (E.D. Pa. 2009)).

The Appellate Division rejected Petitioner's claim. "The obvious flaw in defendant's argument is that Harris was not a defense witness and he was not dissuaded from testifying." Harrity I, 2013 WL 4503337, at *7. "Although defendant characterizes Harris as a defense witness, defendant cites to nothing in the record that suggests he intended to call Harris during his case. To the contrary, the record suggests that the State had intended to call Harris as a witness at least since Harris made his plea bargain." Id. "[U]nlike other Sixth Amendment rights that arise automatically, action by a defendant is required to invoke his right to compulsory process." Drury, 2020 WL 3264083, at *12. "The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct." Taylor v. Illinois, 484 U.S. 400, 410 (1988).

> Here, the State, not defendant, intended to call Harris as a witness. More significantly, the State's warnings to Harris resulted in Harris testifying, not refusing to testify; and defendant was afforded the opportunity to cross-examine Harris about his motive for implicating defendant, his statement to the defense investigator recanting his statement to the police, and his most recent attempt to renegotiate his plea.

Harrity I, 2013 WL 4503337, at *8.

Petitioner argues the Appellate Division's denial of this claim was contrary to Webb. "[] Anthony Harris provided defense investigator . . . with a recanting statement stating that his

(Harris) <u>initial</u> statement he provided to homicide detective
Kevin Kellejan on <u>August 21, 2004</u> was 'false.'"  ECF No. 28 at
50 (emphasis in original).  "There was no need for homicide
detective Kevin Kellejan and prosecutor . . . to re-interview
Anthony Harris on April 13, 2010 and warn him (Harris) of being
charged with perjury if Harris decided to assist the defense by
sticking to his recantation statement rather than testifying to
his initial statement . . . ." <u>Id.</u> at 51-52 (emphasis omitted).
"[] Anthony Harris was in fact a defense witness who was warned
by the state officials of being charged with perjury charges if
Harris decided to assist the defense which interfered with
Harris's free choice to assist the defense . . . ." <u>Id.</u> at 53.

   "[A] state court decision is 'contrary to' clearly
established law where 'the Supreme Court has established a rule
that determines the outcome of the petition.'" <u>Rosen v.</u>
<u>Superintendent Mahanoy SCI</u>, 972 F.3d 245, 252 (3d Cir. 2020)
(quoting <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877, 888
(3d Cir. 1999) (en banc)).  "In other words, it is not
sufficient for the petitioner to show merely that his
interpretation of Supreme Court precedent is more plausible than
the state court's; rather, the petitioner must demonstrate that
Supreme Court precedent <u>requires</u> the contrary outcome." <u>Matteo</u>,
171 F.3d at 888 (emphasis in original).

In Webb,

> [t]he trial judge gratuitously singled out [defendant's only] witness for a lengthy admonition on the dangers of perjury. But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected Mills to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole.

409 U.S. 95, 97 (1972).  The Supreme Court concluded "that the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment."  Id.  This is entirely different than what happened at Petitioner's trial.

As the Appellate Division noted, Harris was a witness for the prosecution, not the defense.  The act of providing a statement to a defense investigator does not make one a defense witness.  There is no evidence that Petitioner engaged in "deliberate planning and affirmative conduct" for the purpose of presenting Harris as a defense witness.  Taylor v. Illinois, 484 U.S. 400, 410 (1988).  "[N]o case cited by defendant involved a witness the prosecution, rather than the defense, intended to present at trial.  And in each case cited by defendant, the witness ultimately refused to testify on the defendant's behalf."  Harrity I, 2013 WL 4503337, at *7.  See also Washington v. Texas, 388 U.S. 14, 23 (1967) (holding defendant's

19

right to compulsory process was violated "because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense").  As neither Washington nor Webb compel a different result, the Appellate Division's decision was not contrary to established federal law.

"A state court's decision is an 'unreasonable application' of clearly established law where 'evaluated objectively and on the merits, [it] resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.'"  Rosen v. Superintendent Mahanoy SCI, 972 F.3d 245, 252 (3d Cir. 2020) (quoting Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999) (en banc)) (alteration in original).  The Appellate Division did not apply federal law unreasonably because the State's reminder to Harris of the terms of his plea agreement is not the interference with a defense witness contemplated by the Supreme Court's compulsory process jurisprudence.

"No practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence."  United States v. Cervantes-

Pacheco, 826 F.2d 310, 315 (5th Cir. 1987).  Plea bargains are essentially "contracts for services that are executory on both sides.  Pursuant to some agreements, the witness' obligation to the state lasts several months, or even years.  The prosecution must therefore retain the power to enforce the agreement for as long as necessary to assure that it ultimately receives the benefit of its bargain."  Spencer Martinez, Bargaining for Testimony: Bias of Witnesses Who Testify in Exchange for Leniency, 47 Clev. St. L. Rev. 141, 148 (1999) (footnote omitted).

Harris, a prosecution witness, attempted to renege on his part of the contract.  "Here, Harris had threatened that he would mess up the trial if he were not promised a sentence reconsideration.  He was not a witness who volunteered to testify for defendant but was scared off by the prosecution – he instead tried to blackmail Sergeant Killejan for a shorter sentence by threatening to commit perjury."  ECF No. 25-9 at 63. See also ECF No. 28 at 111 (April 13, 2010 interview report); 10T104:3 to 105:25 (Kellejan testimony).  Reminding Harris of the consequences of his actions is not interference with Petitioner's defense.  See United States v. Stile, 845 F.3d 425, 431 (1st Cir. 2017) (holding court's warning during sentencing was "a disclosure that educated Stile concerning the risks of

his gambit, rather than as a threat designed to scare off a proposed witness in his defense").

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974).  Trial counsel vigorously cross-examined Harris regarding his plea agreement and statements to the defense investigator, 9T110:1 to 115:11, and continued to attack Harris' credibility in closing arguments, 11T74:12 to 76:5.  See also 11T76:17-22 ("[Harris] is unbelievable, not trustworthy and fits the description of the person who committed this crime.  So when you give his testimony in this courtroom, when you try and get it — give it some weight, zero.  He's unreliable and not believable.  Nobody corroborates it.").  The Appellate Division considered trial counsel's cross-examination and closing arguments and concluded that "'the truth-seeking function of a trial' was served." Harrity I, 2013 WL 4503337, at *8.  This is a reasonable application of federal law.

Petitioner also has not shown that the decision was based on an unreasonable factual determination.  ECF No. 28 at 53. "Section 2254(d)(2) . . . sharply restricts the circumstances in which a federal habeas court may grant relief based on a state court's factual determinations.  The petitioner must show that the state court verdict was based on an unreasonable

determination of the evidence and that a reasonable factfinder could not have reached the same conclusion." Rosen v. Superintendent Mahanoy SCI, 972 F.3d 245, 252 (3d Cir. 2020) (citing Campbell v. Vaughn, 209 F.3d 280, 291 (3d Cir. 2000)). As previously discussed, the evidence at trial indicates that Harris was a prosecution witness testifying pursuant to the terms of his plea agreement.  Trial counsel cross-examined Harris, and the jury made the ultimate determination of Harris' credibility.  The Court will deny habeas relief.

V. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right.  As jurists of reason could not disagree with this

Court's resolution of his claim, the Court will deny Petitioner a certificate of appealability.

VI.   CONCLUSION

For the reasons stated above, the habeas petition will be denied.  A certificate of appealability shall not issue.

An accompanying Order will be entered.


April 28, 2023                          s/ Noel L. Hillman
Date                                    NOEL L. HILLMAN
                                        U.S. District Judge